## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANNIA

| | |
|---|---|
| JOHN FREDRICKS, Individually and For All Others Similarly Situated,<br><br>                    Plaintiff,<br>     vs.<br><br>CONSOL COAL RESOURCES, L.P., JAMES A. BROCK, MARTHA A. WIEGAND, MICHAEL L. GREENWOOD, DEBORAH J. LACKOVIC, KURT R. SALVATORI, DANIEL D. SANDMAN, and JEFFREY L. WALLACE,<br><br>                    Defendants. | No. 2:21-cv-1504<br><br>COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT

Plaintiff John Fredricks ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.      This is a class action brought by Plaintiff on behalf of himself and the other former public unitholders (each a "Unitholder") of CONSOL Coal Resources, L.P. ("CCR" or the "Company") against CCR and the former members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with the Company, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78n(a) and 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the acquisition of CCR (the "Merger") by CONSOL Energy, Inc. ("CEIX").

2.      Up until the Merger, CCR was a growth-oriented master limited partnership ("MLP"), sponsored by CEIX. CCR's assets included a 25% undivided ownership interest and management and control rights in CEIX's Pennsylvania mining complex. On October 23, 2020, CCR announced that it had entered into an Agreement and Plan of Merger ("Merger Agreement"), pursuant to which CCR unitholders received only 0.73 of a share of CEIX Common Stock for each unit of CCR common units owned ("Exchange Ratio" or "Merger Consideration"), and each outstanding Partnership LTIP Award became fully vested and automatically converted into the right to receive the Merger Consideration.

3.      On November 30, 2020, the Board authorized the filing of a materially incomplete and misleading Schedule 14A Definitive Proxy Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act. While Defendants touted the fairness of the Merger Consideration to the Company's unitholders in the Proxy, they failed to disclose material financial information—the Cash Flow and Net Income Projections (as defined below)—necessary for unitholders to assess the Merger Consideration, thereby rendering certain statements in the Proxy misleading.

4.      Under Rule 14a-9(a) Defendants were prohibited from soliciting unitholders via proxy and therein "omitting any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." 17 CFR § 240.14a-9. With respect to projections and valuation-related information, when Defendants chose to voluntarily disclose this information, they assume an obligation under Rule 14a-9 to do so in a complete and accurate manner. In other words, a company may choose silence or speech elaborated by the factual basis as then known, but it may not choose

incomplete half-truths.

5.     Defendants withheld four pieces of material financial information, without which, Defendants presented CCR unitholders with an incomplete and misleading picture of the Company's financials. First and second, the Proxy entirely omitted projections for the unlevered free cash flows (the "CCR Cash Flows") and net income (the "CCR Net Income") that CCR was forecasted to generate during the second half of the fiscal year ending December 31, 2020 through the full fiscal year ending December 31, 2024. *See* Proxy at 53. Third and fourth, the Proxy omitted the financial projections for the unlevered free cash flows (the "CEIX Cash Flows," together with the CCR Cash Flows referred to as the "Cash Flow Projections") and net income (the "CEIX Net Income," together with the CCR Net Income referred to as the "Net Income Projections") that CEIX was forecasted to generate during the second half of the fiscal year ending December 31, 2020 through the full fiscal year ending December 31, 2024 (the Net Income Projections and the Cash Flow Projections are referred to in the collective as the "Projections").

6.     The omission of the Cash Flow Projections rendered the following two portions of the Proxy misleadingly incomplete: (i) the summary of the Discounted Cash Flow Analyses performed by Intrepid Partners, LLC ("Intrepid") on pages 75 and 76 of the Proxy; and (ii) the summary of the Financial Projections of CEIX and CCR on page 53 of the Proxy. The omission of the Net Income Projections rendered the summary of the Financial Projections of CEIX and CCR on page 53 of the Proxy misleading incomplete.

7.     The Cash Flow Projections were utilized by Intrepid to perform a *Discounted Cash Flow Analysis* for both CEIX and CCR. Intrepid performed five valuation analyses in assessing the fairness of the Merger, the Cash Flow Projections were the key input for two of the five, with the remaining analyses looking at comparable transactions and analyses but not actually utilizing

3

the actual projections created by management and reflecting their best currently available estimates of the companies' future financial performance. Indeed, without the Cash Flow Projections, Intrepid would have been unable to perform its discounted cash flow analyses. Accordingly, the omission of the Cash Flow Projections provided unitholders with a misleading incomplete valuation picture.

8.      Similarly, the failure to provide unitholders with Net Income Projections constituted a material omission. This is because Net Income is often considered one the most comparable metrics to those under Generally Accepted Accounting Principles ("GAAP"). The failure to disclose the Net Income Projections obfuscated the financial picture of both companies and provided a misleadingly incomplete representation of the projections tables and valuation analyses summarized in the Proxy. As Regulation S-K of the SEC explains, when disclosing Revenue, it should be disclosed together with Net Income to prevent a misleading representation of corporate value:

> Although traditionally projections have been given for three financial items generally considered to be of primary importance to investors (revenues, net income (loss) and earnings (loss) per share), projection information need not necessarily be limited to these three items. However, management should take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items. Revenues, net income (loss) and earnings (loss) per share usually are presented together in order to avoid any misleading inferences that may arise when the individual items reflect contradictory trends.

17 C.F.R. § 229.10(b)(1). Here, the Proxy disclosed Revenue but withheld the Net Income Projections.

9.      Courts across the country routinely find that cash flow and net income projections are material when deciding whether to approve a merger or assess the value of shares. In sum, if one speaks on a topic, they are bound not only to state the truth, but also not to suppress or conceal

any facts within his knowledge which will materially qualify those stated; if he speaks at all, he must make a full and fair disclosure. Selective disclosure of only a subset of available financial information, while withholding another subset of distinct financial information that would alter the overall valuation picture created by the disclosed numbers, is materially misleading.

10.     As a consequence of the omissions contained in the Proxy, unitholders were unable to assess the value of their equity in the Company. Unsurprisingly therefore, on December 29, 2020, CCR unitholders voted to approve the Merger. Thereafter, the Merger was consummated and, pursuant to the terms and conditions of the Merger Agreement, Transformer Merger Sub, L.L.C. ("Merger Sub"), an indirect wholly owned subsidiary of CEIX, merged with and into CCR, with CCR surviving as an indirect, wholly owned subsidiary of CEIX. Unitholders were not adequately informed when they voted to approve the Merger, because the Proxy omitted the material information and contained the misleading statements discussed herein, which impeded Unitholders from recognizing the inadequacy of the Merger Consideration. The materially incomplete and misleading Proxy was an essential link in the consummation of the Merger, as the Merger could not have been consummated without Unitholder approval, which in turn could not have been obtained without the materially incomplete and misleading Proxy.

11.     For these reasons, as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

<u>**JURISDICTION AND VENUE**</u>

12.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated

thereunder.

13.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with Pennsylvania as to render the exercise of jurisdiction over the Defendant by this Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the Defendants can be found, are inhabitants of, or transact business in this District; (ii) the conduct at issue had an effect in this District; (iii) CCR maintained its principal executive offices within this District; and (iv) Defendants have received substantial compensation via CCR by doing business through, with, and for CCR, which maintained its principal executive offices within this District.

## **PARTIES**

15.     Plaintiff was, at all relevant times, an owner of CCR Common Units.

16.     Defendant CONSOL Coal Resources, L.P. (previously defined as "CCR") is an MLP formed in 2015 to manage and further develop all of CEIX's active coal operations in Pennsylvania. The CCR Common Units were listed on the New York Stock Exchange ("NYSE") under the symbol "CCR." CCR is a Delaware company, with its principal executive offices located at 1000 CONSOL Energy Drive, Suite 100, Canonsburg, Pennsylvania 15317-6506.

17.     Defendant James A. Brock ("Brock") served as Chief Executive Officer and Chairman of the Board of CCR at all relevant times. Defendant Brock served as the Chief Executive Officer and Chairman of the Board of CONSOL Coal Resources GP, L.L.C. (the "General Partner") at all relevant times. Defendant Brock served as the President and Chief

Executive Officer of CEIX at all relevant times.

18.     Defendant Martha A. Wiegand ("Wiegand") served as a director of the Company at all relevant times. Defendant Wiegand served as the General Counsel, Secretary, and director of the General Partner at all relevant times. Defendant Wiegand served as the General Counsel and Secretary of CEIX at all relevant times.

19.     Defendant Michael L. Greenwood ("Greenwood") served as a director of the Company at all relevant times. Defendant Greenwood served as a director of the General Partner at all relevant times.

20.     Defendant Deborah J. Lackovic ("Lackovic") served as a director of the Company at all relevant times. Defendant Lackovic served as a director of the General Partner at all relevant times.

21.     Defendant Kurt R. Salvatori ("Salvatori") served as a director of the Company at all relevant times. Defendant Salvatori served as a director of the General Partner at all relevant times. Defendant Salvatori served as the Chief Administrative Officer of CEIX at all relevant times.

22.     Defendant Daniel D. Sandman ("Sandman") served as a director of the Company at all relevant times. Defendant Sandman served as a director of the General Partner at all relevant times.

23.     Defendant Jeffrey L. Wallace ("Wallace") served as a director of the Company at all relevant times. Defendant Wallace served as a director of the General Partner at all relevant times.

24.     Defendants Brock, Wiegand, Greenwood, Lackovic, Salvatori, Sandman, and Wallace, formed the Board of Directors of both CCR and the General Partner and are collectively

referred to herein as the "Board" or the " Individual Defendants," and together with CCR, the "Defendants").

25.     Defendants Greenwood, Sandman, and Wallace formed the Conflicts Committee which approved the Merger on October 22, 2020, referred to herein as the "Conflicts Committee." In connection with the Merger, on December 30, 2020, all members of the Conflicts Committee stepped down from their respective roles as members of the Board of Directors of the General Partner.

## RELEVANT NON-PARTIES

26.     CONSOL Energy, Inc. ("CEIX") is a producer and exporter of high-Btu bituminous thermal and crossover metallurgical coal. It owns and operates some of the most productive longwall mining operations in the Northern Appalachian Basin. Its flagship operation is the Pennsylvania Mining Complex, which has the capacity to produce approximately 28.5 million tons of coal per year and is comprised of three large-scale underground mines: Bailey, Enlow Fork, and Harvey. CEIX is a Delaware company, with its principal executive offices located at 1000 CONSOL Energy Drive, Suite 100, Canonsburg, Pennsylvania 15317-6506.

27.     CONSOL Coal Resources GP, L.L.C. (previously defined as the "General Partner") was the general partner of CCR. Its board of directors and executive officers manage CCR. The General Partner was wholly owned by CEIX. The General Partner was a Delaware company, with its principal executive offices located at 1000 CONSOL Energy Drive, Suite 100, Canonsburg, Pennsylvania 15317-6506.

28.     Transformer LP Holdings, Inc. ("Holdings") was a Delaware corporation and a wholly owned subsidiary of CEIX. Holdings was formed on October 19, 2020 solely for the purpose of effecting the Merger. Holdings' principal executive offices were located at 1000

CONSOL Energy Drive, Suite 100, Canonsburg, Pennsylvania 15317-6506.

29.     Transformer Merger Sub, L.L.C. ("Merger Sub") was a Delaware limited liability company and a wholly owned subsidiary of Holdings. Merger Sub was formed on October 19, 2020 solely for the purpose of effecting the Merger. Merger Sub's principal executive offices were located at 1000 CONSOL Energy Drive, Suite 100, Canonsburg, Pennsylvania 15317-6506.

## CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other former public Unitholders of CCR who received the Merger Consideration (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

31.     This action is properly maintainable as a class action because:

(a)     the Class is so numerous that joinder of all members is impracticable. As of November 27, 2020, there were 27,690,251 CCR Common Units outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country. The actual number of public Unitholders of CCR will be ascertained through discovery;

(b)     there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

  i.     whether Defendants misrepresented or omitted material information concerning the Merger in the Proxy, in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9;

  ii.    whether the Individual Defendants violated Section 20(a) of the

Exchange Act; and

    iii.    whether Plaintiff and other members of the Class suffered damages as a result of being compelled to vote their shares for the Merger based on the materially incomplete and misleading Proxy.

(c)    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)    the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f)    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)    a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## **SUBSTANTIVE ALLEGATIONS**

## I.    **Background to the Merger**

32.    Prior to the Merger, CCR was positioned for growth as a stand-alone company. Indeed, the Company's stock had fallen off during the COVID-19 Pandemic ("Pandemic") but was poised to rebound during the winter months when the Company ordinarily experiences

increased sales volume. Simply stated, the Board agreed to accept Merger Consideration that undervalued CCR Unitholders' shares. And, as set forth in detail below, Defendants then negligently allowed a Proxy to be disseminated to the Company's Unitholders that omitted material information—the Projections—that would have (i) alerted CCR Unitholders to the fact that the Merger Consideration was inadequate, and (ii) enabled them to properly assess the value of their units. As a result of the Proxy's material omissions, the Proxy presented a materially incomplete and misleading picture of CCR's valuation and future financial prospects and the Merger Consideration.

**II.      The Proxy Omitted Critical Financial Projections, Which Rendered the Summary of Intrepid's Valuation Analyses and the Projections Incomplete and Misleading**

33.      On November 30, 2020, Defendants solicited CCR Unitholders to vote in favor of the Merger by causing the materially incomplete and misleading Proxy to be filed with the SEC and disseminated to the Company's Unitholders. The Proxy, which recommended that CCR Unitholders vote in favor of the Merger, omitted and misrepresented material information about the intrinsic value of the Company and its future prospects, and caused CCR's Unitholders to be misled when they voted in favor of the Merger without access to the below-referenced material information that was necessary for them to make an informed decision regarding whether to approve the Merger.

34.      Defendants, as directors and/or officers of the Company, had a duty to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's Unitholders to ensure that it did not contain any material misrepresentations or omissions. However, as set forth herein, the Defendants acted negligently by omitting the Projections which rendered specific portions of the Proxy misleadingly incomplete, thereby damaging Unitholders.

35.      As a general matter, it is undisputed that information relating to the financial

condition, solvency, and profitability of a company is plainly material to its unitholders. Complete and accurate financial projections are necessary for unitholders when deciding how to vote on a merger, because company managers and bankers with inside information have meaningful insight into a company's future that the market does not. Thus, complete and accurate projections speak directly to the question forced upon unitholders by a merger: does the merger consideration adequately compensate me for my shares? It is that very question why corporate actors have an obligation when voluntarily electing to speak regarding projections and valuation-related information to do so in a complete and accurate manner.

### A.   **The Cash Flow Projections Were Material**

36.     Free cash flow projections are the single most important financial metric when valuing a company for sale. For this reason, the disclosure of cash flow projections is a staple in the vast majority of proxy statements filed by publicly traded companies being acquired in corporate mergers. Defendants conspicuously withheld any form of the companies' Cash Flow Projections from Unitholders despite electing to include a table of projections on page 53 and incompletely "summarizing" Intrepid's *Discounted Cash Flow Analysis* on pages 75-76.

37.     The primary projection metric disclosed on page 53 (Adjusted EBITDA) *is not sufficient analog for the Cash Flow Projections*.[1] Well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised upon the company's projected future cash flows, not projected Adjusted EBITDA.[2] Intrepid agrees, as

---

[1]     The summary does not even disclose the required information for Unitholders to independently calculate cash flow projections.

[2]     Cornelius J. Casey and Norman J. Bartczak, *Cash Flow—It's Not the Bottom Line*, Harvard Bus. Rev. (1984) ("A growing number of securities analysts, financial writers, and accounting policymakers contend that financial statements providing information of a company's cash flows yield a better measure of operating performance than do the company's income statement and balance sheet. According to recent surveys, corporate and government officials have accepted this

indicated by their use of the Cash Flows Projections—not Adjusted EBITDA—in performing their

discounted cash flow ("DCF") analysis, and academics and practitioners concur.

38.     There are fundamental differences between free cash flows and Adjusted EBITDA.

A company's EBITDA is a quite arbitrary figure obtained after assuming certain accounting

hypotheses regarding expenses and revenues. On the other hand, free cash flow is an objective

measure, a single figure that is not subject to any personal criterion.[3] As described in an article

from the Risk Management Journal:

> EBITDA is really just a spiffed-up version of traditional cash flow, its quick-and-
> easy, slick appeal hides its significant shortcomings as an accurate shortcut to
> calculating cash flow.
>
> 1.     EBITDA ignores a company's tax obligation, which is a cash-absorbing
> expense. Remember its origins as a stable measure of performance in the
> early days of cable TV, when the years of losses precluded any need to pay
> income taxes.
>
> 2.     It assumes that fixed assets don't require capex replenishment, a stretch of
> credulity for fast-growing firms.
>
> 3.     It overlooks the working capital requirements for more investing and
> accounts receivable to support growing sales.
>
> 4.     Public companies are often committed to maintaining a steady record of
> declaring and paying dividends, and interruption of dividend payouts may
> hurt company market values.

---

view; they rated **cash flow data the most important piece of information contained in
published financial statements**. The trend toward wider acceptance of this yard-stick has been
building since the early 1970s. Accelerating the trend have been several developments … that put
greater distance between a company's net income and its cash flow.") (emphasis added).

[3]     Dev Strischek, *E-B-I-T-D-A, It Doesn't Spell "Cash Flow"*, The RMA Journal, November
2001, available at:

https://cms.rmau.org/uploadedFiles/Credit_Risk/Library/RMA_Journal/Cash_Flow_Analysis/E-
B-I-T-D-A_%20It%20Doesn't%20Spell%20'Cash%20Flow'.pdf.

In stark comparison, "free cash flow is accurate because it shows the cash coming in and the cash going out whereas with net income, one has to worry about accrual accounting, non-cash charges such as depreciation and most importantly, heavy manipulation. The main advantage that free cash flow has over earnings is that it can't be manipulated as much."[4] Simply stated, EBITDA is an accounting number used for reporting purposes, but free cash flow is the actual amount of cash available to investors, and is therefore a material financial metric to them.

39.     While the CCR Cash Flows were of obvious importance to their own Unitholders, the CEIX Cash Flows were also of material importance to CCR's Unitholders considering that the Merger Consideration was comprised of a fixed amount of CEIX common stock; accordingly the value of CEIX on both a stand-alone basis and pro forma basis was equally as important. In other words, the value of CEIX's stock and, as a result, the Merger Consideration was also premised on the CEIX Cash Flows.

40.     Furthermore, the use of the CEIX Cash Flows by Intrepid indicates that the CEIX Cash Flows were required to properly assess the fairness of the Merger Consideration and value of CEIX. By failing to disclose any projections for CEIX, but most importantly the CEIX Cash Flows, it was literally impossible for CCR Unitholders to compare the value of their units against the value of CEIX's shares according to the approach favored by Defendants' own financial advisor, or even check that Intrepid's inputs and assumptions were reasonable. By withholding the CEIX Cash Flows, the Proxy skewed the financial picture of CEIX and the Merger Consideration and prevented Unitholders from assessing the value of CCR and CEIX independently, and impeded CCR Unitholders from recognizing the inadequacy of the Merger Consideration.

---

[4]     David Thomas, *Why Free Cash Flow Is Better Than Earnings*, Shares and Stockmarkets, (July 29, 2013), available at: https://sharesandstockmarkets.com/free-cash-flow-v-earnings/.

41.     In sum, the Cash Flow Projections were plainly material information which Defendants were negligent in omitting from the Proxy, especially since the Cash Flow Projections were readily available, utilized by the financial advisor to value the Company, and were the key input in Intrepid's most important valuation methodology.

B. **The Net Income Projections Were Material**

42.     The Net Income Projections are also plainly of importance to Unitholders as Net Income is the most directly comparable GAAP financial measure available to equity holders. Because corporate management seek to portray their companies in the most-favorable light, they routinely include unstandardized non-GAAP projections in communications with unitholders, which make their companies look more valuable than they really are.  The SEC has taken note of this misleading practice and, in recent years, has heightened its scrutiny of the use of non-GAAP financial measures in unitholder communications. Revenue/Adjusted EBTIDA are non-GAAP "fantasy math" numbers. By omitting the Net Income Projections from the Proxy and disclosing only the falsely inflated non-GAAP Revenue/Adjusted EBITDA projections, the Proxy may have made the Merger Consideration look more valuable than it actually was.

43.     In sum, the financial analyses performed by Intrepid clearly demonstrate that the most reliable and appropriate method of valuing CEIX and the Merger Consideration was through the use of CEIX's after-tax cash flows on both a stand-alone basis and pro forma basis. However, the CEIX Cash Flows and Net Income Projections were withheld from Unitholders. This constituted a material omission, which rendered the Proxy, including the summary of the *Discounted Cash Flow Analyses* appearing on page 72-73 of the Proxy, materially incomplete and misleading.

III.   **The Omission of the Cash Flow Projections Rendered the Following Portions of the Proxy Misleadingly Incomplete**

A.   **The Misleading Summary of Intrepid's Discounted Cash Flow Analyses**

44.     First, the omission of the Cash Flow Projections rendered the "summary" of Intrepid's *Discounted Cash Flow Analyses* on pages 75-76 of the Proxy misleadingly incomplete. As set forth herein, Intrepid could not have performed its DCF analyses without the Cash Flow Projections. By withholding the Cash Flow Projections, CCR Unitholders were unable to properly assess the fairness of the Merger Consideration. Simply put, a so-called "summary" of a valuation analysis is misleading if underlying assumptions or key inputs are omitted, particularly when unitholders are impeded from recognizing how significantly undervalued their shares are as compared to the "implied" valuation range they have been given because of the omission.

45.     To support their fairness opinions, financial advisors perform several types of valuation analyses. Here, Intrepid performed a DCF analysis for CCR and CEIX. *See* Proxy at 75-76. A DCF analysis is highly subjective and prone to manipulation to ensure the desired outcome— that the merger consideration and transaction at issue appear "fair" to unitholders. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions:

> A fairness opinion's worth ultimately lies in the reliability and accuracy of its underlying valuation analyses. This is the realm of finance - and academics have made significant strides in the previous decades to develop techniques by which a theoretically reliable range of values can be achieved. However, there is still an element of subjectivity present in the choice and application of these methods. **The end-result is to provide the preparer discretion to effect the outcome of a valuation and a diminished ability for outsiders to make comparative assessments of analyses**.
>
> There are a number of different underlying valuation analyses upon which a fairness opinion can rest. The most common and accepted techniques are discounted cash flow, comparable companies, premium, break-up, and liquidation analysis. The preparer of a fairness opinion will typically utilize a weighted

combination of these to arrive at a fairness conclusion. The choice of a particular analysis to employ and the weight given to each is partially subjective and depends upon the asset being valued and the relevant circumstances. **For example, in the corporate control transaction paradigm the most important analysis is, absent unusual circumstances, the discounted cash flow calculus**. However, in the investment banking community, there are no uniform, specific, and objective guidelines as to the exact mix and weight to assign to each of these methods to arrive at fairness.

Each of the techniques in and of themselves is also prone to subjectivity. **For example, a discounted cash flow analysis is conducted by discounting back at a chosen discount rate the projected future free cash flows and terminal value of an asset. In performing this analysis there are three central choices, which must be made, each of which can significantly affect the final valuation. These are the correct forecasted free cash flows to utilize, the appropriate discount rate, and the terminal value of the asset. There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars**. However, again there is no standard-setting or other body guiding these or other preparation decisions. Rather, a discounted cash flow analysis, like other valuation analyses, is typically compiled using historically developed and unguided industry practices as influenced and first put forth by academic practitioners. This lends itself to differences in valuation approach in each application and among institutions as each of them develops their own individual approach. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.

**This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness**. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Steven M. Davidoff, *Fairness Opinions*, 55 Am. U. L. Rev. 1557, 1573-78 (2006) (emphasis

added).

46.     Furthermore, as noted earlier, the Cash Flow Projections (the most important projected metric to understanding a DCF analysis) were not provided at all. By withholding the key inputs that formed the basis of Intrepid's *Discounted Cash Flow Analyses* that was

incompletely "summarized" in the Proxy, Defendants could hardly have done a better job of obfuscating Intrepid's financial analyses, even had they deliberately set out to do so.

47.     As noted on page 71 of the Proxy, "Intrepid believes that its analyses **must be considered as a whole** and that selecting portions of its analyses and of the factors considered by it, without considering all analyses and all factors in their entirety, could create a misleading or incomplete view of the evaluation process underlying its opinion." (emphasis added). The Cash Flow Projections were indisputably the key input for Intrepid's valuation analyses. The failure to provide the most important financial projections that were necessary for the banker to conduct its valuation analyses did, in fact, create a misleading and incomplete view of the financial analyses performed by Intrepid and the resulting implied valuation ranges.

48.     Simply stated, one cannot properly assess and recognize the legitimacy or lack thereof of a financial advisor's fairness opinion valuation analyses unless the key financial metrics and inputs associated with the analyses are disclosed. Here, the Defendants allowed the Proxy to incompletely and misleadingly "summarize" Intrepid's valuation analyses. The summaries of Intrepid's *Discounted Cash Flow Analyses* on pages 75-76 of the Proxy were materially incomplete and misleading, because it failed to disclose the key inputs that were necessary for CCR Unitholders to fully evaluate the legitimacy of the analyses and assess the Merger Consideration.

### B.   <u>The Misleading Summary of the Projections</u>

49.     Defendants elected to summarize CCR's financial projections on page 53 of the Proxy, but they excised and failed to disclose the Projections.

50.     As stated above, the financial projections provided on page 53 of the Proxy do not include the Cash Flow Projections that were used by Intrepid in its *Discounted Cash Flow Analyses*

nor do they provide a comparable GAAP metric. Therefore, the Company's financial projections cannot by any objective measure be considered a fair summary of the key inputs utilized by Intrepid for its valuation analyses. It strains all credibility to claim that disclosing a set of projections that were to be used by a financial advisor in connection with its fairness opinion for a board of directors, but omits the most important financial projections, constitutes complete and accurate disclosure.

51.     The omission of the Projections rendered the projection tables on page 53 of the Proxy incomplete and misleading because, without the Projections, the summary of *Financial Projections of CEIX and CCR* provided a misleading overall valuation picture of CCR. In light of the significant differences, as discussed in detail above, between free cash flows on the one hand, and the projected metrics that Defendants elected to disclose in the Proxy—Adjusted EBITDA— the table of projections on page 53 of the Proxy presented a misleadingly incomplete overall valuation picture of CCR. By failing to include the Projections, the table provided an obfuscated valuation picture of the Company. The Projections were irreplaceable for Unitholders to fully, fairly, and properly understand the Company's projections and value.

52.     In sum, the omission the of the Projections rendered the summary of Intrepid's *Discounted Cash Flow Analyses* and the stand-alone financial projections provided in the Proxy incomplete and misleading, in contravention of the Exchange Act. The materially incomplete and misleading Proxy was an essential link in the consummation of the Merger, as the Merger could not have been consummated without Unitholder approval, which in turn could not have been obtained without the misleading Proxy.

### COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

53.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

54.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

55.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications with unitholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

56.     The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

57.     Defendants issued the Proxy with the intention of soliciting Unitholder support for the Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which contained multiple misleading summaries and omitted critical information regarding the Company's financial projections and Intrepid's valuation analyses.

58.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, as officers and/or directors, were aware of the omitted information but failed to disclose such

information, in violation of Section 14(a).

59.     Defendants knew or were negligent in not knowing that the Proxy was materially misleading and omitted material facts that were necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Merger. Indeed, the Proxy states that Defendants were privy to and had knowledge of the financial projections for CCR and the details surrounding discussions with other interested parties and Intrepid. Defendants knew or were negligent in not knowing that the material information identified above had been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review Intrepid's analyses in connection with their receipt of its fairness opinion, question the bankers as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material omissions.

60.     Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully. Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the review of CCR's financial projections and Intrepid's valuation analyses and fairness opinion.

61.     CCR is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

62.     As a direct and proximate result of the dissemination of the misleading Proxy Defendants used to obtain Unitholder approval of the Merger, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Merger and the true value of their units prior to the Merger) in an amount to be determined at trial. By reason of the misconduct detailed herein, Defendants are liable pursuant to 14(a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

63.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

64.     The Individual Defendants acted as controlling persons of CCR within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of CCR, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete, false, and misleading.

65.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.     In particular, each of the Individual Defendants had direct and supervisory

involvement in the day-to-day operations of CCR, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Merger. The Proxy at issue contains the unanimous recommendation of the Board to approve the Merger. The Individual Defendants were thus directly involved in the making of the Proxy.

67.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

68.     By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

69.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.*, the difference between the value they received as a result of the Merger and the true value of their units at the time of the Merger) in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Awarding Plaintiff and the Class compensatory damages sustained as a result of Defendants' wrongdoing, including, but not limited to, pre-judgment and post-judgment interest;

C.      Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

D.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


DATED: October 21, 2021

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
T: (212) 971-1341

**KAHN SWICK & FOTI, LLC**
Michael J. Palestina
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
T: (504) 455-1400
F: (504) 455-1498

*Attorneys for Plaintiff*

**LAW OFFICE OF
ALFRED G. YATES, JR., P.C.**

By: /s/ Alfred G. Yates, Jr.
Alfred G. Yates, Jr. (PA17419)
Gerald L. Rutledge (PA62027)
1575 McFarland Road, Suite 305
Pittsburgh, PA 15216
T: (412) 391-5164
F: (412) 471-1033
e-mail: *yateslaw@aol.com*